Good morning, Your Honor. To start the week off right, I'd like to begin with saying that the government did everything it could in its power to get the head of Jean Baptiste on a platter in this case. And I say that because if you look at our view of the case, the defense view of the case, which is that the bargain for the primary witness, Mr. Louis Sennett, who claims to have engaged in $2 million of fraud with my client, the jury goes to deliberate thinking, well, he's going to be prosecuted. That's what everybody's been told. And they also go to go into their jury room thinking, well, the government must know that the defense's witness who said who has explained how Mr. Louis Sennett's testimony is wrong, how his claims of not dealing with with Mr. Marvin Pagnon, the person whose involvement we pointed to as being responsible. Well, you can just disbelieve everything she said because we've come up with some biased, biased speculation with regard to her. And so to think that those two things would not have influenced the jury, I think requires more than the certainty that the court would ordinarily want in conducting a harmless error analysis. With regard to the attack on the defense witness, the government has tried to move away from the justifications that the district court offered for admitting the testimony. And there's a number of reasons why they may have done that. The district court said, well, we can have the surprise testimony in rebuttal of someone who will testify that, well, at some at some point in the past, the witness said something about the defendant offering or something to come in and testify. And that that but the government learns this during trial. It's it is true that we don't know exactly what what we know about this, but what we do know is that we didn't get any reports about it, that we didn't get any advance notice about it. As far as the record. As far as the record shows, the government learns about this alleged bribe during the trial. They they do learn about what they this alleged this hearsay about something that is vaguely in the in the area of what the government calls a bribe sometime during trial. And the circumstances are important because the witness is still on the stand. The witness is on the stand. The defense has not rested yet. The government says nothing. The government having the prosecutor, not the agent, the prosecutor having engaged in a telephone call with this person and having obtained some kind of information the night before, because they were very unhappy that the witness supported the defense, that the two other witnesses had also supported, that the the circumstances also supported both physical evidence and and the chronological evidence. Everything supported the idea that Marvin Pagnon was involved, was doing this and could be responsible for it for this. And so we have a phone call last minute phone call while the witness while the defense witnesses on the stand. Does the court because the government come in the next day and say to Judge Martinez, oh, you know, Your Honor, before we go forward with this witness before Mr. David Garvin, the defense attorney goes forward with this witness. We think you ought to know something. We have some information about a potential impropriety here. No, no. And yet the government on appeal argues the residual hearsay exception applies, which recall calls for clearly calls for advance notice. Instead, everything is one thing. It Baptiste did not object. To a lack of notice, he does come in, right. He objected to the statement as hearsay. He objected to it as not being not appropriately being admitted under the statement against. Yeah, but it doesn't but doesn't raise an issue about notice or needing a continuance or anything like that. No, because there's well, let me get to the continuance point first, but to the residual hearsay exception, that's something that's only mentioned on appeal. That's not offering a trial. Right. With regard to the continuance, the defense has just rested in front of the jury. This surprise testimony comes out as the as the part of the government's rebuttal. It's so surprised that the government previously says we're not giving a rebuttal witness list. They don't even ask any questions of the witness that they're trying to rebut on going to the merits. Their whole case against the defense is this surprise quote unquote hearsay statement, which we never actually hear. We never hear. What is it this woman allegedly said to her brother? What is it she said? If you can scour the record, I still can't find it. Yet this is what we're supposed to ask continuance about. We're supposed to tell the court we need a continuance. We need to say to the jury to stop. Even though we've given you the idea we've rested, the defendant has already been queried about not testifying. He's not going to testify. Stop. We'll stop everything. We'll go try to investigate. We'll see if she can get a lawyer. If she needs a lawyer, we'll try to find out and go on a lark and a frolic about it. Instead, what they did was they preserved objections and they went forward. I don't believe that the issue of continuance came up, and I don't believe that that should be the governing standard for whether they were prejudiced by this hearsay. The hearsay, again, the government characterizes in the worst possible way as a bribe, is this, that, and the other. This is the most that comes out of the statement. Well, I got the understanding that she was going to get a car out of this. And we still don't know. What does that mean? All we know is what we know from it. I took it to mean, to infer that she had been offered by Baptiste a Mercedes in exchange for favorable testimony. Which is clearly, if that's what happened, it's clearly hearsay. Because there's no such, what is the theory under which that comes in? It simply does not. They've advanced one at trial. It doesn't hold up. The witness was not available. They didn't even try to make the witness unavailable. They didn't make the slightest effort. They didn't even question her about the facts. Not a single fact did they question her about because they had this in their pocket. They wanted to spring this ambush. So the ambush knocks out their residual hearsay argument. I don't know what other argument they have. It's pure hearsay. It was critical. And again, going back to my first point, when you balance out the effect on a jury, if they know Maltimore is getting a pass, you want to talk about a Mercedes? He's getting 100 Mercedes. Because he's $10 million, $2 million of fraud. He's an illegal alien and he's getting a pass. He can stay in this country. Not Maltimore. Lewis St. And that's something the jury would have liked to have known. And when we find out, when the witness is actually given an opportunity to respond, and we find at document 89-1, she goes point by point. She says, the agent came to me basically to follow up. I would characterize it as to say, hey, we got this guy who says this about you. After trial, she comes back and hammers it. She's unafraid. She has an open book about it. It's bogus. It was an intra-family nonsense. Intra-family nonsense deprived this man of a fair trial. The other issues compound the rest of it. The government over-exaggerated. Again, calling it a bribe, calling it false testimony. There was nothing about that statement that said false testimony. Nothing about that statement that said false testimony. Even in the worst reading of it, it was not false testimony. The government never even cross-examined her on the facts, never had an inkling that something about her testimony that they could show was false. And that's part of the problem with the obstruction enhancement at the end. The judge makes no findings as to what it is she supposedly said that was false. Nothing. I've actually got a question for you about the sentencing piece. I can't quite tell from our precedent, and I'll ask the U.S. attorney as well, if findings, if explicit findings are required as sort of a threshold matter or not. As I read, I guess it's called Zia Tagore, whatever. It sounds like findings might be required. And as I read a follow-on case called DeCampo, it seems like findings might not be required if there are other indicia of reliability. Are findings required, the obstruction, for use of reliable hearsay in sentencing? In general, for use of reliable hearsay, no. There has to be. I think there has to be a clear enough record of the district court relying on reliable hearsay. Under the Lee case, I think it was 68 of third something. I can't remember the case site exactly. Well, the case that I read initially, which I'm guessing is pronounced Zia Tagore, Z-I-A-T-O-G-U-R, reliable hearsay is fair game on sentencing. So long as the evidence has sufficient indicia of reliability, the court makes explicit findings as to credibility, and the defendant has the opportunity to rebut the evidence. Now, so I'm trying to figure out the second piece of that, explicit findings as to credibility. Is that required sort of as a threshold standalone basis, or is it just sort of part of the gestalt? And what we're really after here is indicia of reliability. Well, I think you have to go at it enhancement by enhancement for that analysis. I don't know that you can do a global answer to that question. Certainly for obstruction, since the Dunnegan case in the Supreme Court, there's been a requirement of greater specificity because perjury and obstruction, those concepts themselves have a very narrow focus, even in the conviction area, so that you want to make sure that the judge is just saying, I just didn't like the way this woman testified. I didn't like the sound of her voice. I'm going to impose an obstruction. And all of the cases in the obstruction area of that apply. The fact that we've got this additional layer of hearsay, which they don't bring in Cherry. They don't bring in the witness that they had the first time that never said what this person actually said in the first place. They don't bring her in for sentencing. We bring in the expansive sworn declaration of Frances Cherry, explaining exactly why the fellow had made this up. With regard to the vulnerable victims, I think the government concedes that dead, deceased people are not, in this circuit, are not vulnerable. Incarcerated persons are. I'm sorry? Incarcerated persons are. I know, but there was absolutely no showing of any such people actually existing. There was talk about them, but you can't get a vulnerable victim enhancement for talk. Thank you, Ron. Any questions? Thank you. You've saved five minutes for rebuttal, Mr. Kluge. Mr. Wu? May it please the Court, Jason Wu on behalf of the United States. With me at Council table is Michael Berger, who tried the case. This morning, Mr. Baptiste has claimed that a number of errors undermined his ability to present his defense, blaming Marvin Pagnin for his crimes. But that defense failed because it did not fit the facts, not because of any error on either the government's part or the court's part. And I'll turn first to the hearsay or non-hearsay question regarding the testimony. She wasn't available, right? She wasn't unavailable. She – I think there is a marginal argument to be made, candidly, for her unavailability, which is where a witness takes the stand and essentially won't give answers that they've given before, won't give the truth. But there she's saying repeatedly, can't remember, don't know, and here the witness said, no, right? I agree with that, Your Honor, and that's why I say, candidly, it's a marginal argument. Let me turn to what I think is the best argument for our case. Residual? It's not residual either. I think the clearest exception in which this falls. I actually think that is your best argument. Let's hear what you think the best argument is, and then we'll go to what he thinks the best argument is. So now I've been properly educated that it's the residual exception. But that being said, now I think there are two that clearly apply. The first, I would say, is the agency exception in 801D2D. And the reason is that it fits within the plain text of that exception. That exception covers a statement offered against an opposing party. Here we offer the statement against Mr. Baptiste. The statement has to be made by the party's agent or employee. Where's the evidence of that? So there's corroboration of that relationship. Well, let me say, first of all, of course, the statement itself must be considered, right, as a part of the evidence that the court uses to determine whether the agency relationship exists. So here we have the statement. Of course, it's admitted through Anayel Sherid, but he says his sister said to him, I'm going to receive a Mercedes-Benz in exchange for holding up my end of the bargain. That's what he says in his testimony on pages 82 to 86 of Docket Entry 120. It makes you an agent? It makes you an agent given the context in which those remarks are made, which is it's about a promise of testimony. And, of course, you cannot, it's not just simply to come in and give any testimony. It has to be testimony that's favorable to him. It has to be testimony that fits within his defense theory and what he intends to present at trial. So I read a case in response to your agency theory called Franza v. Royal Caribbean where we said, citing I think the restatement third, that agency requires, among other things, control by the principle over the actions of the agent, which I think squares with my intuitive notions of what agency is. How is it that Baptiste controlled Francais? So, again, this is why I said in context it makes sense that he would only put on a witness that he could control, right, because he can't just have her give any testimony in the world. He needs to explain to her what his defense theory is and what he intends to present at trial, which is why she presented this targeted testimony placing the blame for his offenses on Marvin Pagnin. It's exactly what he wanted her to say. And that wouldn't come about by mere coincidence. And we know this because when he spoke to Mr. Royce... Control is evidenced by her just performing? I would think so. In the same way that, for instance, when you hire a lawyer and you see the lawyer perform in the courtroom and they seem to be advocating the client's precise position, you would understand that that was done in consultation with the client. It's that sort of agency relationship. It's implied by her action. It's implied by her statement. And significantly, it's corroborated by Mr. Louis Saint, who says that he spoke to Baptiste after or around the time when Baptiste was being charged, and Baptiste specifically told him, first, I'm going to blame everything on Marvin Pagnin. Second, I want you to come in and serve as a witness for me. So he was actively seeking people willing to give this favorable or perjured testimony. And moreover, he said, I don't want you to be an open book with my lawyer when we talk about this. We need to square ourselves. Essentially, he was implying we need to agree on a version of the facts first before you ever reach my lawyer. So with this argument of agency that you're advancing, any time anybody bribes a witness, wouldn't they necessarily become the agent? With the caveat, yes, Your Honor, but with the caveat that it will not always be admissible because there might not be sufficient corroboration. Here, I'm offering some corroboration not only through the testimony of Louis Saint, who, by the way, on page 32 of Documentary 119, specifically said, Baptiste told me he was searching for five witnesses. So again, there's corroboration. Baptiste is actively out there looking for witnesses willing to fill this role. And moreover, there's corroboration in the fact that the exchange, the consideration mentioned, is a Mercedes-Benz automobile that's very close to the model and make that Baptiste actually owns. And bear in mind, this is a Rule 104 initial preliminary determination of admissibility. And this is something where it's going to go in front of the jury. The jury has to decide whether it's credible or not, whether it's worth weighing, in light of other factors that might make it slightly less persuasive. And they ultimately have to determine whether to credit these witnesses. That's the only hurdle we have to get over is that initial Rule 104, Rule 801 hurdle of admissibility. And for that reason, we see that there's significant corroboration in the record. So to answer your question, just the mere fact that we think there might be a bribe is not enough. We do have to come forward with some corroboration for that. The second exception that applies here is the residual hearsay exception. And I say this because these are truly extraordinary and unusual circumstances. This does not often happen. We had a witness who took the stand, and in fact, although— You had the notice problem. I agree with that, but as you mentioned, Your Honor, first of all, Baptiste did not object on any sort of notice ground to this issue. And secondly, given the circumstances that we had, there was very little opportunity. Essentially no opportunity to provide more notice than we gave. But when he objected hearsay, did you say, don't worry, 807? No. We answered with the statement against interest declarant unavailable exception. And I'll note on that he never replied or he never objected and said, wait a minute, the witness is available. And the court never raised it. So in some sense, the parties mutually overlooked that requirement when discussing the residual— when discussing the declarant unavailable statement against interest exception, and they focused on whether it was genuinely against interest. Again, the reason I ask is that in fairness, you know, had you said 807, he might have scrambled to get his book out and seen that 807 has a notice requirement and said, wait a minute, Your Honor, they haven't given the proper notice that 807 requires. Right? But if you're saying 801, he gets his book out, sees something else. There's no requirement of sort of notice like there is in 807. So maybe he doesn't know to raise his hand and say notice. I agree it's not directly tied to that rule, the other exception. But of course, he also might have wanted to raise this problem of lack of notice in the context of asking for a continuance or something to that effect. And he didn't seem to have any problem with it in that sense. Nor did he ask to, you know, for special discretion— the court to, in its discretion, allow him to bring Frances Sherry back to explain the remark or any sort of additional serve rebuttal on that front. So in some—first of all, I think those two hearsay exceptions apply. But let me explain also why the error was harmless. And let me try to tackle that in a few ways. The first is this. Normally when we're talking about the admission of evidence that the defendant thinks should have been excluded, the but-for world we're looking at is a world where that evidence doesn't come in front of the jury at all, right? We can imagine a retrial where that evidence will never be presented to the jury. Here it's not quite the same, and I think that should inform your analysis because this would be admissible as an impeachment statement under 613B. And I acknowledge then it would not be for the truth of the matter, so it would be slightly different. But bear in mind, this witness's credibility would still be heavily damaged in front of the jury because in a retrial, if she emerges as a witness again, she can be, as my friend has mentioned, she can be more directly asked about the statement. She can be given a chance to explain it. And then the government will still be able to admit Anayel Shari's testimony under 613B. So I would ask you when you weigh the harmlessness of the error, first of all, consider the fact that the but-for world that you should compare it to is one in which the statement comes in merely as impeachment, but nonetheless still effectively damages this witness's credibility and wipes out her value to the jury. But moreover, as I started this argument, the Pagnon defense simply did not fit the facts, and let me explain why. So the documentary evidence in the case comprehensively rebutted the notion that Pagnon was the one responsible. All of the bank accounts into which these checks flowed, Baptiste was the sole signer on them. Moreover, all of the checks that he was depositing, there are many checks with glaring red flags of fraud, and he was the one who had to deposit them since he was the sole signer on those bank checks. So to give an example, at docket entry 119, 127 to 28, there's a discussion of 11 checks deposited on the same day. I believe it was June 28, 2010. Every single one of them had the exact same street address for the purported party receiving the check. Nine of those 11 checks had the exact same amount, $1,338. Two of them varied by $30. Two of the 11 had $1,308. Moreover, Baptiste's own admissions were that he ran the business by himself. When he was inspected by the IRS, before realizing, of course, that he was under criminal investigation, he told IRS agent Deborah Boyce that he was the only one who cashed the checks, docket entry 116, page 175. Similarly, when the Florida inspectors came to visit him and asked him how he got customers, he did not say, I have a friend, Marvin Pagnin, who refers me people who have had their taxes prepared. He said that he went out and handed out flyers, and in particular that there was an Alcoholics Anonymous location in the same shopping complex and that he found it productive to hand out flyers outside of those meetings. That's a docket entry 117, pages 36 through 37. And, of course, some of the strongest evidence against him are the other documents, including the fact that he filed an application for a new check-cashing processing service, Governments Exhibit 46A through E. He does that after Marvin Pagnin is dead. And significantly, you would expect that a person who's innocent, who doesn't realize that his business has been used for fraud, would file a legitimate application for such a service. Instead, he files an application that contains false and fraudulent tax returns that greatly increase the reported earnings from this business compared to the actual returns that he filed in 2009 and 2010. Finally, there's even more. But let me mention as an aside, the strongest intuitive point that they had in favor of their defense, it does have superficial appeal. What he argued to the jury was that Marvin Pagnin died in December of 2011. I get searched in January 25, 2012, and there are no checks cashed between that time. So that shows that the fraud has ended because of Marvin Pagnin's death. However, that's not the reason for the absence of checks. The reason for that absence is the seasonality of the tax business. The last tax refunds in the year are filed on October 15, the late filing deadline. The first day the IRS accepts filings for the next year, January 29. That gap always exists, and indeed it exists in the record in every year that preceded this critical 2011-12 time period. In 2009-2010, there's a gap. It's between December 31, 2009 and January 28, 2010. The next year, in 2010, the gap is from November 22, 2010 to January 31, 2011. And that's evident in Government's Exhibit 8, which is a comprehensive set of these checks. But talking about Pagnin for a second, which he's going to be pointing, obviously is pointing to Pagnin as sort of the mastermind of the scheme. Let me talk for one moment about the reverse 404B, that he wanted to get in information that Pagnin had participated in this scheme in prior circumstances, but the trial court judge did not allow that in. How do you deal with our case of U.S. v. Cohen, where we said it was error to exclude evidence of witnesses' prior participation in a similar scheme? Yes, so the trial judge here essentially honored the dictates of Cohen by allowing Mr. Baptiste to admit a substantial amount of evidence, enough to make that argument that Mr. Pagnin had been responsible for an independent scheme. So let me explain. There were three witnesses who were pertinent to this matter. There was Frances Cherie, who we've discussed extensively, a woman named Collette Caesar, and a man named Adler Claude. And collectively, what they testified to, so what was allowed in front of the jury and what they heard, was that Pagnin operated a different check-cashing business named Caribbean Capital, that he did so using straw or nominal owners. Caesar and then Claude were always listed as the owner of the business when, in fact, Pagnin operated it. And independently, through the government's case, there were checks admitted indicating that there might have been fraud at Capital Caribbean as well. That was Government Exhibit 10. So he had all the ingredients he needed to make the exact argument that was foreclosed in Cohen, which is Pagnin had the capability, the independent capability, to operate the scheme without me because he's done it before, because he had a pre-existing business or scheme that looked a lot like this. So they got all of that in. What was not admitted was a very minor piece, which was that Pagnin purportedly told lies to Caesar and Claude that were similar in nature to the lies that he purportedly told Mr. Baptiste concerning his reasons for wanting to open the business in Mr. Baptiste's name. That's it. And that's why we fit within Cohen. Can I ask you to help me quickly with the sentencing question that I was asking your adversary? I can't quite tell, frankly, from our precedent whether to use reliable hearsay in sentencing, the district court must make explicit findings regarding reliability, credibility, or whether that's just part of the overall indicia of reliability analysis. And if there are explicit findings required, did the district court here make any? Your Honor, I have to confess that I'm not familiar with the exact passages of those two cases you cited. I personally have not seen always that there's a need for express findings concerning reliability. And I would also point out— But DeCampo said there's not a requirement if it's apparent from the record why the evidence is— why it's reliable. And so make your argument then why it's apparent from the record. This will help. Why is it apparent from the record that the evidence was reliable? Sure. Well, first of all, let me note, under my argument of the agency exception, it's not hearsay at all. Right. That would pull it out of this line of cases. But in terms of its reliability, as I mentioned, I think one of the substantial pieces of corroboration is that Anay El-Sherry identifies the automobile make and model in question being very close to the model that Baptiste actually owns. In fact, it's off by one letter. It's a Mercedes-Benz CLA instead of a Mercedes-Benz CLS. But given the closeness of that, it's hard to believe that he would have completely fabricated that claim and gotten that close. And moreover, as I mentioned, Louis Saint said that Baptiste had been actively searching for these witnesses. He'd been doing it for a year since he began to fear that he was being charged. And I think that brings it within the scope of sufficiently reliable hearsay, particularly given the recency and time between the statement and the trial. It was made just a few weeks before the trial. Let me briefly touch, my opponent did mention the idea that Louis Saint received an undisclosed benefit from the government, and I want to rebut that. And I have a few responses, but the bottom line is that the government did not promise prosecution to Louis Saint, so there was nothing to disclose. And first, I'll note, we have an incomplete record here because he did not raise this in the context of a new trial motion or in any forum in which the district court would have had an opportunity to make findings and take evidence on this matter. So for that reason alone, you can reject it as pure speculation. There's not enough in the record to make that claim. But second, even on the record we have, we can understand the reasons why ultimately he was... You're over. Oh, I apologize. I did not see that in that case. Your Honors, I would respectfully ask that this court affirm Mr. Baptiste's convictions and order the limited sentencing remand that we requested earlier. Thank you. Thank you. Please. Thank you. Turning just to the findings issue, entirely apart from findings about hearsay and its reliability, as we cited in our reply brief at 24 to 25, with regard to obstruction, there's an even heightened requirement of specific findings on obstruction. The government has made no argument even about that issue in their brief and has not made an argument today about it. The district court... It was. Let's try to... Obstruction was not. I think he's responding to my questions about the obstruction enhancement and whether findings are required under our precedent. Okay. Judge Pryor has said, and I'd be interested in your response to this, that DeCampo makes pretty clear that findings might not be required where it is apparent from the record that the hearsay, if we're assuming at this point that it is hearsay, is otherwise reliable. Mr. Wu has made a powerful case that it is reliable because it's corroborated by the record, and your response is... At the end, there's no point basically in sending it back to the district court for explicit findings when we know what the district court would say. Right. The reason is, even as we stand here today, we do not know what part of the testimony the district court finds to be incredible. Is he talking about something she said about Pagnon? Is he talking about something she said about Caribbean check cashing? Is she talking about something about her relationship with Pagnon? She was his fiancée at the time he died. Is she talking about the meetings with Loisan? Or is she talking about the matter she wasn't cross-examined about, didn't have an opportunity to truly address, the new matter raised by her brother at the end that she filed an affidavit about? He made no findings about her affidavit. So it really is a very incomplete record on the obstruction, and I think there's no question under Dunnegan that it should be remanded on that basis. The government did not address the vulnerable victim, so I won't either. I do want to address the notion of agency. The government argues for corroboration, and they cite Loisan. What Loisan said is very important, because it doesn't corroborate anything about what Loisan said was that after Pagnon died, my client made a statement to him after he had been audited indicating he blames or he's going to blame Pagnon. That is not in and of itself contradictory. That's actually sort of halfway a prior consistent statement. What's important for the corroboration is once Loisan dies, over four years pass, even though every document that the government has talked about has been obtained from my client, the government never alleges he does anything wrong from the moment Pagnon dies, and they never prosecute him. It's only when Loisan walks in again and walks out the door without prosecution and gives this statement that our witness says is completely untrue. He had a working relationship with Pagnon, but our witness is shot to pieces by the surprise incomplete hearsay. So the notion that an agency applies because you have an undefined statement about somebody, it's not even clear what they're talking about, whether he heard her say that or whether he came to understand that from her. You derive an agency understanding from that? It's impossible. And this notion that Garvin, the defense attorney, is supposed to ask for a continuance at this time, the defense has wrested the case. We're in rebuttal. We think we're trying to close the evidence. We're trying to get out. We think we've won the case. It's putting a burden on them. There's nothing in the hearsay rules that says you're supposed to ask for a continuance. What about Mr. Wu's argument that even if we assume this is hearsay, the error is harmless? What about the 613b piece? Well, I think you have to go count by count, certainly. And again, it goes part to their evidence of what their evidence is. The evidence against him, there was no dispute that he ran the check-cashing store. Of course, he's going to deposit the checks. He never disputed running the check-cashing store. The question is Louis Sant's bogus statement that he's paying my client a million dollars because my client has a $50 or $100 Adobe Photoshop program. It was completely ridiculous. He's paying him a million dollars on $2 million of checks because he doesn't want to get his own Adobe program. So that's the context of how... That's why he's not prosecuted for four years. How could it not be harmless? You can't even go into the grand jury for four years until you get Louis Sant to come in and come up with this story, which we debunked. But beyond that, the story is who's making these IDs. It's all about who's making these IDs. And there was zero physical evidence that my client is making them. What physical evidence is there of actual IDs in that building? It's a bag in a corner that belonged to Marvin Pagnon. Again, further corroboration not of their story, but of our defense. But again, it's all wiped out by that. I certainly wish I could stay and talk with you. I'll give you 30 seconds since he went over. Thank you so much. Again, the notion that this hearsay statement is reliable because he described the Mercedes, he didn't just get the number... He didn't just get the letter of the car wrong. He got the number wrong, and he knows Jean-Baptiste. He knows Jean-Baptiste. He sees him driving the car, and he still can't get the car right. That was not a reliable statement. We don't even know what the statement was. It's simply not a case where you can stay with reliability that we could win. I would take odds from anybody here today that given the facts as we know them now with Louis Sant walking the streets, we'd win this case. I would take a bet from anybody. Thank you. Thank you, Mr. Kluge.